May it please the court, Timothy Blood on behalf of Appellant William Murr. Your Honors, this case involves one variable known as I sub T in an interest adjustment provision of an annuity contract, and whether that formula can be applied as written in the annuity contract when Midland stops selling the annuity at issue, which is known as the legacy bonus 11. Based on the undisputed facts, the district court erred by not applying the plain terms of the unambiguous, fully integrated, and complete contract as written. Further, the court also erred in invoking the missing term doctrine, a doctrine that is rarely applicable. Here, not only was there no missing term, but the circumstances giving rise to the dispute, Midland deciding to stop selling a particular type of annuity product was a known commonplace event at Midland and throughout the annuity industry. This event was in no way unforeseen or even unlikely. Finally, the district court erred when it rewrote the contract and deemed the rate Midland chose a reasonable rate, despite evidence to the contrary. The district court assumed that the rate Midland paid on additional premiums after it no longer sold the legacy bonus 11, was automatically the same as the rate Midland hypothetically would have offered on new legacy bonus 11 contracts if it continued to sell them. But the evidence is that Midland discontinued the sale of the legacy bonus annuities because of changes in economic and In fact, determining a hypothetical market rate is not possible. Midland chose not to market the legacy bonus 11, so there was no interest rate. And that is what should have been applied to the plain terms of the contract. Therefore, the district court's grant of summary judgment in favor of Appley Midland and its denial of Mr. Murr's summary judgment motion should each be reversed. First, with regard to enforcing the contract as written, the district court never should have considered a missing term analysis. Because absent an ambiguity, courts must enforce the plain language of the provisions of an insurance contract. Here, it is undisputed that the contract was unambiguous, that the contract was fully integrated, and that the contract contained all of the terms governing the contractual relationship. Therefore, there could be no missing term. In its answer, Midland conceded that the contract fully informed Murr of the terms and conditions of the annuity policies, and that no material information was withheld. In response to Murr's separate statement of material facts in connection with the summary judgment motions, Midland also admitted that plaintiff's annuity contract fully informed him of all of the terms and conditions of plaintiff's annuity contract. Further, it is undisputed that the interest adjustment formula in the contract can be applied as written. So one can either put a zero in the formula, or since there was no interest provided because the policy was no longer being sold, simply not include that provision of the formula, and the result would be identical. And mathematically, it could be done. What would be the consequences to Midland if your view prevailed? Well, the consequences would be that Midland would not retain as much money or pay out not as much money. But the contract would work identically, the contractual provisions would still work the same as intended. There would still be an interest adjustment. Midland would still have an interest adjustment cap, which is something that Midland puts in its contracts to prevent it from having to pay out too much money under the interest adjustment under any situation. So the contract would still work exactly as it was intended to work. The sharing of who would receive the money at time of surrender would just be a little bit different than what it was under the method that Midland chose to do it. So- Would it adversely affect the actuarial assumptions under which these contracts are written? I don't know. I mean, presumably not. It's Midland's contract, and even if it did, it wouldn't really matter.  And there's no provision in contract law, even under the missing term analysis, that says that the fact that perhaps Midland made a mistake, or Midland got it wrong in its actuarial analysis, there's no evidence of that, by the way. But even if that's the case, that doesn't let the insurance company off the hook for complying with the terms of the contract. Well, question. As I understand it, you have, we have a formula. Yes. That was agreed upon. Yes. And one term of the formula is to be determined by looking to the interest rates on new certificates. Correct. Yes, the current interest rate offered for new certificates. But there are no new certificates. Correct. Okay, so you say that that term then should be zero. Correct. Now, why would it be zero instead of simply a blank? It could be either zero or a blank, and the undisputed evidence from both plaintiff's expert and And also, there's also case law, this is not the case, but there's also case law, and Midland sort of hints at this in its papers that, where someone says, well, you can't have a mathematical formula that results in an undefined number. And that's actually the Sixth Circuit's case in Transact Technologies, where zeros were placed into the formula, and it was zero divided by zero, which is an undefined number. And the court, the Sixth Circuit there said, well, that's perfectly fine, that just means it's zero. And here, everybody's in agreement that the formula can be applied as written. You know, the formula results in a number at the end of the day, and it's not a nonsensical number. Well, I guess my question or my point is, you argue that that term should be replaced by zero. And I'm wondering why it can't just as logically be replaced by a blank that then has to be filled in by the court, according to the under the restatement section, where there is a missing term in the contract. Because the missing term doctrine should not apply. The parties agree, it's undisputed that the contract is complete and covers all of the rights and obligations of the parties. That is an undisputed fact in the case, in Midland's answer, in a separate statement. That issue is off the table. But even beyond that, if there is no market for the product, then there is no rate. And that's what the contract says, and that's why it should be zero. And the court shouldn't step in and guess at what that rate would be. The contract should be enforced as written. And the district court erred in picking its own rate and calling it reasonable. But that would completely unhinge the contract and allow Midland to pick any rate that it wanted to, which is what occurred, as opposed to sticking to the terms of the contract. Well, let's say you lose on your initial point here that you've just argued. And the decision here is that the court determines that the term must be supplied by the court. Then that term should- So what's your position there? What should the court use in supplying that figure, number one? And then number two, in answering that question, would there be, in this case, issues of fact that should be tried in order to reach that, in order to supply that term? To your second question, yes. That would create an issue of fact, what is a reasonable rate that should be put in. But the missing term doctrine should not apply because this was not an unforeseen event. There is nothing, everything in the record indicates that Midland absolutely knew that this was a common event. At Midland itself, Midland regularly discontinued annuity contracts during the surrender period of products. Since 1999, 52 annuity products were discontinued by Midland. Of all the annuities with interest adjustment formulas like this, nearly half were surrendered after Midland stopped selling the product. After Midland sold the product to Mr. Murr, but before surrender, the Indiana Department of Insurance and some other insurance regulators called Midland out on this practice. And Midland, for Indiana customers, changed the contract to reflect what it subsequently- it can state whatever it wants in the contract, but it had to actually change the contract. After this lawsuit was filed as a result of the lawsuit, it also changed the contracts going forward to have an interest adjustment provision that makes sense. Further, this is nothing new in the annuity world. There's plenty of evidence in the record that shows that other annuity companies, before the policy was ever sold to Mr. Murr, handled this issue in a number of different ways, and none of them did it the way Midland does, which is allow Midland to just sell, select an interest rate after the fact. I mean, keep in mind, the way this provision works is it is a market rate. It is a rate that is supposed to be set by the market. So as long as they're selling the legacy bonus 11 contract, then the market is going to set what that interest rate is going to be. But as soon as they stop selling that policy, there is no market to set that rate. And, in fact, the undisputed evidence is the reason why Midland naturally didn't stop selling the legacy bonus 11 is because economic and business decisions changed, conditions changed, so Midland no longer wanted to sell the policy. It was a policy that wasn't marketable anymore. And that's why it should go down to zero. So this is a long way of answering the first part of your question. The rate should either be zero. If there is a missing term, then it's an insurance company who knew what the issue was and should live by its own contract. So that number should be zero. We made an argument. Quite honestly, there's not a lot of basis for it. The guaranteed rate in policies, in these policies, is 2%. The guaranteed rate in the insurance policy doesn't have anything per se to do with this, but it is the rate that is generally used as sort of a default rate for a number of other portions of the policy. So those two rates are possible rates. But I think the most logical rate, even if there was a missing term, is zero. It's Midland's contract. They knew what they were doing, and they chose to discontinue the sale of this. Nobody else did. It's not like a typical missing term case where some truly unforeseen circumstance happened, typically out of the party's control, and that's what resulted in a missing term. You know, the case where the bank went under and nobody anticipated the bank going under, so they didn't have an interest rate that was set by an external market rate set by a bank, something like that. Here, Midland regularly discontinued the sale of annuities because those annuity products were no longer viable. Your Honor, if I may keep the remaining time for rebuttal, I would appreciate it. Thank you, Your Honor. Good morning, Your Honors. James Martin for Midland. Good morning. David Bird with me at council table. There has been a lot of arguments offered up critical of the district court's decision to resolve this case, relying on Section 204 of the restatement. But as the briefing reveals, Your Honors, this case is tailor-made for Section 204, and on the record that was before the district court, it manifestly acted reasonably in supplying the term in the contract it did, putting the rate of interest in on new premiums received for the legacy bonus 11 contract. Let me start where council left off. In Section 204, there is no foreseeability requirement. By its terms, the section only requires interpretive principles to have failed, and so there is manifestly a missing term in the contract. Here, as the briefing makes clear, both sides concede there's a missing term because interest rate IT cannot be calculated based on the four corners of the agreement after no new contracts are sold. Now, the comments to Section 204 do contemplate that in certain circumstances, foreseeability can be an element, but the case law makes it clear that that's not a requirement. They have cited no case that suggests that, and all you need is the circumstances where the four corners of the agreement don't supply the answer. Now, as to the plain language construction that's been offered up, there is no plain language construction that conceivably could result in a zero rate of interest here. That is manifestly, again, a rewording of every part of Section 6.3, which makes no reference to a specific rate of interest, no reference to zero, and certainly doesn't say in the circumstances where no new Legacy 11, Bonus 11 policies are sold, the interest rate will be zero, which is the extent of the redrafting that would have to be done to accept that. Well, what did your salesmen or salespeople tell applicants for this type of policy? This is what's going to happen if interest rates go up. This is what's going to happen when interest rates go down. The record is undisputed on that, Your Honor. The plaintiff did receive information regarding the interest adjustment, and it provided specifics on how the adjustment would work in the fashion that you've suggested. And there's no debate in this case either that Mr. Murr understood that that was the function of the interest adjustment. That actually ties to the reasonableness inquiry in this way. In supplying the term that Midland did or that the court did for the interest adjustment, using the 3.55 percent interest rate fulfills the purpose of that provision. And to pick up on a thread from some of the other questions, putting a zero in there manifestly, again, will not fulfill the purposes of that provision. And the record is uncontradicted that the effect of that would be devastating. It would be devastating to the actuarial analysis that's part of the contracts. It would be devastating to persisting policyholders whose benefits would suffer. It would be devastating to the financial stability of Midland. There is no way this contract regulatorily would have been approved with a zero interest rate. Midland has never used one. And the expert testimony makes it clear that a zero rate would never be accepted. And also there would be no sales. That's right. I mean, a consumer is not going to purchase a product with a zero interest rate under any circumstances. There was some suggestion here also that Midland is acting arbitrarily in setting these rates and that in relying on the rates, Midland is not doing something that is reasonable. I think the implication is, therefore, the court erred in accepting that. Again, the record is uncontradicted as to the way Midland calculated this internal rate. It did it exactly the way that it had done from the time the policies had started. It did it exactly the way it was done for other policies. The rate, in fact, fluctuated with the market just as was intended. And perhaps most importantly, the reasonableness of the internal method that Midland used was substantiated by the record testimony as well, and that was not contradicted. Why was it reasonable? Because the internal method that Midland used was tied to the actual investments that Midland made. Two of the experts said specifically that that was a proper way to calculate the rates because of that close tie. Not only that, that functioning internal method has regulatory approval as well. There was a suggestion about Indiana looking at the language of this contract. Two things there. Indiana never directed that the language of the contract should be changed, and Midland did not change the contract language. It changed the form. But second, Indiana regulators didn't criticize the method that Midland used, nor did they say it's improper to have an interest adjustment in a contract. In fact, it's beneficial to have it. The last issue that I want to address, and then, of course, I'll take questions, has to do with whether there's a question of fact lurking here if we assume that the zero rate can't be accepted. Section 204 and contract construction principles generally are for the judge. They do not contemplate jury involvement. And the issue before this court on review is, does the record substantiate that the district court made a proper choice in accepting the reasonableness of Midland's rate setting? Aren't questions of reasonableness typically fact questions? Two things in response to that. In terms of making the choice here under Section 204, in looking at what is reasonable, all the cases make clear, Section 204 make clear, that ultimately at the end of that, that is for the judge. It's a forward-looking inquiry. It doesn't require resolution of past facts. It requires the judge to evaluate the record that is in front of him or her and determine what is reasonable, and then it's left with the court to do that. There is no case that suggests that a jury issue lurks there at all. And, in fact, Iowa law is quite clear that this is a principle of contract construction. It's intended to determine the legal relationship between the parties. And when those are the issues, it's for the court. Do you have a case that has taken up this question that you can direct us to where a court has considered the question of whether restatement Section 204 and its instruction that the court must fill the gap, whether there are never, can never be fact questions that must be tried in the application of that restatement section? I don't have a case that says that beyond the cases that apply the four corners of what the section says. But, Your Honor, if we were concerned that it ultimately got to a fact issue, we are not going to find one on this record in any event. And the reason that we're not is there is uncontradicted evidence in this record of the reasonableness on Midland's part in the way it set its internal rates, both in following its traditional methodology and in the way the rates were calculated. So the judge had before him uncontradicted evidence supporting a reasonableness determination and the one that he made. There is concomitantly, Your Honor, no other evidence in the record that suggests that there is another reasonable method to use in this circumstance. In other words, my question could not, back to the foreseen, unforeseen argument. Was this foreseeable to Midland? What happened here? It was foreseeable that a contract could be discontinued. It wasn't foreseeable to Midland that a zero rate of interest would be the construction given the contract later. That would have been something that they – Well, would it have been impossible for Midland to specify the way the new rate would be calculated? No, it wouldn't have been impossible, Your Honor. But the issue is was it missing from the contract, and plainly it was. Section 204, as I said, doesn't – I'm sorry. Why was it missing from the contract? Again, I've missed that. Midland didn't think it was missing from the contract, Your Honor. It had its own interpretation on what the current rate of interest should be and how it should be calculated. Well, it didn't have to live by its faulty assumptions. Well, but what that leads to here, Your Honor, is a missing term in the contract where the four corners of the agreement don't supply the answer. And in that instance, Section 204 doesn't adopt a position that favors insurers, doesn't favor insurers, favors large corporations, or doesn't. It's an equal opportunity employer that looks at supplying a reasonable term so the party's legal relationship can continue. And so perhaps Midland could have done something different. The fact is that it didn't, and that's what triggers 204. I want to finish up on the reasonableness point really quickly. There is no evidence in this record that suggests that what Midland did, number one, was unreasonable, or, number two, that there was another reasonable method to use. And there was discussion about external rates. There was discussion about perhaps arbitrary conduct by Midland, but no substantiation in the record from any witness, including Mr. Long, the plaintiff's expert, that suggested that the way Midland did it was unreasonable, or, alternatively, that there was another reasonable and customary way to do it. And, again, the issue before the court here, discreetly, is did the district court in making the choice under Section 204 adopt a reasonable term to insert? Not the best term, not any possible term, but a reasonable term. And on that issue, again, the record is uncontradicted. The reasonableness of Midland's method was established by the witnesses who testified about it. Those witnesses were not contradicted, and the district court then had the foundation to make the determination that it did as a matter of law, consistent with Section 204 and consistent with the FDIC and other cases that we've cited where there are missing terms in agreements on rates, on price, on quantity, on time, on dates. Now, it's true that Section 204 operates in a very narrow window, but the restatement put it into the contract formulation for a reason. There are situations where the parties have a definitive agreement, where the agreement fails as a matter of interpretation and construction needs to supply a term. It asks the court to do that based on the evidence that's submitted. That's exactly what the district judge did here. That's a sound result and one that is fair in terms of the relationship of the parties, given the way the interest adjustment was intended to work. Go ahead. Back to this foreseeability. Is your argument that the parties should have foreseen this? No, Your Honor, it's not. My argument, I guess, would be that foreseeability is a red herring. Foreseeability is not a requirement of Section 204. Section 204 operates in the present. It operates over the dispute that is presented to the court. Okay, and the dispute here, let's see, getting back to basics, this dispute arose because interest rates went down? No, this dispute arose because they're within the four corners of the agreement. According to the construction offered by the plaintiffs and accepted by the district court, there is no means of calculating interest rate I sub T in circumstances where no new legacy bonus 11 contracts are sold. And this would have been foreseeable to Mr. Muir as well as to Midland or to neither? In other words, I'm looking at it from the viewpoint of the insured. From the viewpoint of the insured, a missing term is a missing term. It still creates the same. This is not, Your Honor, an interpretive principle. It's not looking at the four corners of the agreement and trying to wrench something out of the language that isn't there. It is operating. Again, your closest case on point is what? The FDIC cases that we've cited on the interest rates, which are in the brief and are a perfect corollary for what's going on here. Excuse me, does Midland have a facility in today's world where we also have something called computers that run 24-7, 365, and somebody at home says, oh, my golly, I'm worried about those interest rates or I'm losing sleep, I'm going to get up out of bed and I'm going to go to my computer and I'm going to plug it in and bang, I should have an answer. Does Midland provide that kind of facility here for this policy? Yes. The current interest rate that Midland charges for its policies is on its website, and in fact plaintiff's broker consulted the website to find out what the interest rate would be on surrender here and got it in a matter of seconds. It's very transparent in that respect. And as is the purpose of the current interest rate in terms of the surrender of the policies and the role that it plays. May I ask one more question? Of course. Well, this is what bothers me about the situation. If Restatement Section 204 applies, it talks about the court supplying the term that's reasonable under the circumstances, I think is maybe the term that's used. In this record, is there evidence that was before the district court, for example, about community standards, about the financial market standards, or about the intentions of the parties, for example? After all, this is a contract. Yes. It seems it's very difficult for me to, I guess, embrace the notion that the court can simply plug in a number without answering some factual questions here. Let me try to unpack that top to bottom. Section 204 agrees that choices will need to be made on what is reasonable and provides some factors to look to in making that choice. The choice is for the judge on the record that's made. There's no implication in 204 that it's a fact issue. Well, I mean, it says the court. Right. It doesn't say the judge. It says the court. Well, it says that it's up to the court to supply the term. That's the express words in 204. So all of the cases that deal with 204 when there's a missing term, the court is making the decision. Fact finders aren't consulted. Second, there is evidence in this record of the reasonableness of Midland's calculation in light of the market factors that you mentioned, Your Honor. The internal method that Midland used that keyed the rate to its own investments is an accepted methodology. The experts vouched for it, and there wasn't any dispute about that in the record. Well, you may want to take a look at Baber against First Republic Group, which was a district court case from Iowa, Northern District, where the court submitted questions as to what would be reasonable to the jury. The issue in this case on reasonableness, it didn't give rise to a jury issue under any circumstances, as I said before, because the reasonableness tilt only went one direction, and there was no countervailing evidence. There would be nothing in the end for a jury to decide here. This would be like an ordinary summary judgment that is unrebutted on the record. There theoretically could be fact issues out there, but the court grants summary judgment because it tilts one way, if you want that as an analogy. And then one more time, is it your position that it would not have been possible for your client to include within its contract a provision that would have spelled out what the interest rate should be in this type of situation? It is my position that Midland could have done that. It's a fact that according to the construction offered by the district court, it did not. It did not or it did? It didn't. Could or didn't? Yes, but that isn't the trigger for Section 204. 204 assumes that it didn't happen. Well, okay, we'll find out or we'll decide that. Very well. Thank you for your argument. Mr. Blood, you have some time for rebuttal. Thank you, Your Honor. On the issue of reasonableness, procedurally, plaintiff was merely responding to a motion for summary judgment, and so it only needed to put facts into dispute. It did not need to establish what a reasonable rate should be on Midland's motion for summary judgment. And plaintiff certainly put those facts in dispute. The evidence submitted by plaintiff's actuary, Terry Long, discusses why the 3.55% rate was not reasonable, why it would not match up to a market rate once the product was no longer sold, how they would disconnect, and how Midland's costs, things like acquisition costs, commissions, costs decrease when an annuity product is no longer offered for sale. So Midland would require less money, less interest income to cover those costs. Therefore, the rate should be lower. But in response to summary judgment, naturally, plaintiff did not put in evidence about what that rate should be. It simply disputed the position taken by the parties. Finally, with regard to the contract language itself, Midland argues in its brief that the contract would somehow require the contract language requires an analysis of what the market rate should be or, as Judge By mentioned, at what rate consumers would buy the product. But keep in mind what's happened here is Midland chose to no longer sell this product because it didn't feel that it could either make money on it, or in order to make money on it, no consumer would buy it, which is why it's an artificial exercise to try to approximate a market rate for a product that is no longer viable in the marketplace. And let's see. Again, your version of – oh, I should say your version. But again, what happened in Indiana? So in Indiana, about four years before Mr. Murr surrendered his policy, Indiana noticed this problem with the contract, which is different than any other annuity contract we were able to find, and said, you know, what are you doing here? How are you treating people when the policy is no longer being offered for sale? And Indiana made Midland change its contract language, actually modify the contract language, and Midland did so. And what it did is it said in the event that there are no longer – the product is no longer being sold, we will use the equivalent of the new money rate. And so it wrote that in its contract, and we don't have a problem with it. It could have done that. Other insurance companies use index market rates, you know, a LIBOR rate or some other type of rate, some sort of external rate to – that would mimic a market rate. But it's an artificial exercise to try to mimic a market rate for a product that is not marketable, which again is why we believe zero is the appropriate number.  Thank you for the argument. Thank you. This is submitted, and we will take it under consideration.